## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

RICHARD DICKERSON,  )
                    )
    Petitioner,  )
                    )    No. 2:19-cv-02168-TLP-tmp
v.                  )
                    )
WARDEN KEVIN GENOVESE,  )
                    )
    Respondent.  )

## ORDER DISMISSING PETITION, DENYING CERTIFICATE OF APPEALABILITY, CERTIFYING THAT ANY APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Richard Dickerson petitions pro se under 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody.[1]  (ECF No. 1.)  Respondent has answered the petition and filed the state court record.  (ECF Nos. 12 & 13.)  And Petitioner filed an amended petition.  (ECF No. 14.)

For the reasons below, the Court **DISMISSES** the petition and **DENIES** a certificate of appealability.  The Court also **CERTIFIES** that any appeal would not be taken in good faith and **DENIES** Petitioner leave to proceed in forma pauperis on appeal.

I.    **State Court Procedural History**

In July 2012, following a trial in Shelby County Criminal Court, a jury convicted Petitioner of one count of second-degree murder.  (ECF No. 12-1 at PageID 70.)  The trial court sentenced Petitioner to twenty-five years in prison.  (*Id.* at PageID 71.)  Petitioner appealed.  (*Id.*

---

[1] Petitioner is an inmate at the Turney Center Industrial Complex ("T.C.I.X.") in Only, Tennessee.  His Tennessee Department of Correction ("TDOC") prisoner number is 508885.

at PageID 77.)  And the Tennessee Court of Criminal Appeals ("TCCA") affirmed his conviction and sentence.  *State v. Dickerson*, No. W2012-02283-CCA-R3-CD, 2014 WL 1102003 (Tenn. Crim. App. Mar. 19, 2014), *perm. app. denied*, (Tenn. Sept. 3, 2014).

In September 2015, Petitioner petitioned pro se for post-conviction relief in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101-122.  (ECF No. 12-17 at PageID 1303–35.)  The state court then appointed counsel to represent Petitioner in those proceedings.  (*Id.* at PageID 1340.)  Petitioner's appointed counsel amended the post-conviction petition.  (*Id.* at PageID 1344–49.)  After conducting an evidentiary hearing, the court denied relief in July 2017.  (*Id.* at PageID 1351–60.)  Petitioner appealed.  (*Id.* at PageID 1362.)  And the TCCA affirmed.  *Dickerson v. State*, No. W2017-01572-CCA-R3-PC, 2018 WL 5307893 (Tenn. Crim. App. Oct. 25, 2018), *perm. app. denied*, (Tenn. Feb. 25, 2019).

## II.    Federal Court Procedural History

Petitioner petitioned pro se for a writ of habeas corpus under 28 U.S.C. § 2254 with this Court in March 2019.  (ECF No. 1.)  The Court directed Respondent to file the state court record and respond to the petition.  (ECF No. 6.)  Respondent answered the petition and filed the state court record in July 2019.  (ECF Nos. 12 & 13.)  And Petitioner amended his petition.  (ECF No. 14.)

The original petition asserts three claims for ineffective assistance of trial counsel.  (ECF No. 1 at PageID 5–8.)  Petitioner's amended petition asserts two of those claims.  (ECF No. 14 at PageID 1538–41.)  Petitioner claims that trial counsel gave ineffective assistance by: (1) "coercing and or forcing [Petitioner] to testify at trial against his will"; and (2) "not correct[ing] the [trial] court's erroneous application of [Petitioner's] criminal history."  (*Id.* at PageID 1538,

1541.)  The TCCA has reviewed both issues so Petitioner has exhausted his available state remedies.[2]

## III.    The Evidence

On direct appeal, the TCCA summarized the evidence presented at Petitioner's trial:

The Defendant was charged with committing the first degree premeditated murder of his girlfriend, Jacklyn Miller ("the victim"), in November 2010.  At his sequestered jury trial, conducted in July 2012, the following proof was adduced:

Jacqueline Smith testified that she was the victim's mother.  She last saw the victim on Wednesday, November 17, 2010.  After this visit, Smith tried to contact the victim numerous times over the next several days via text messages and phone calls but got no response.  Alarmed, she called the police department on that Friday and filed a missing persons report.  She reported that the victim's boyfriend was Richard Dickerson.  Some time later, the police called and informed her that the victim's body had been found.  At the time, the victim's car was a green Mazda 626.  The victim was twenty-one years old.

Sergeant Kathy L. Gooden of the Memphis Police Department ("MPD") missing persons bureau testified that she received a missing persons report from Jacqueline Smith in November 2010.  In response to the report, she prepared a missing persons flyer including a photograph of the victim.  She also called Richard Dickerson, reported as the victim's boyfriend, to inquire if he had heard from the victim.  She identified the Defendant at trial as Dickerson.  The Defendant told her that the victim had spent the night of Monday, November 15, 2010, with him and that the last time he saw her was the next morning when she left.  Sgt. Gooden learned that the victim had not reported to work on that Thursday and Friday.

When Sgt. Gooden called the Defendant a second time to inquire if he had heard from the victim, the Defendant reiterated that the last time he saw the victim was on that Tuesday morning.  He added that the victim called him the next afternoon, Wednesday, November 17, 2010, at about 4:00 p.m.

After receiving a tip from Crime Stoppers, Sgt. Gooden and two other officers went to the Defendant's residence to speak with him in person.  The Defendant then admitted that the victim "had previously gotten an order of protection on him on a domestic violence assault."  The Defendant also stated that

---

[2] Petitioner's amended petition abandons the third claim from his original petition, an unexhausted claim for ineffective assistance of counsel alleging that his trial counsel "failed to provide alternate DNA testing of the evidence" and "ignore[d] the inconsisten[t] hearsay opinion identification of the state's witness."  (ECF No. 1 at PageID 8.)  Because Petitioner abandoned this claim, the Court will not address it in the analysis below.

he had contacted the victim's aunt because he "had had a gut feeling that something had happened to" the victim. Sgt. Gooden later confirmed that there had been a previous domestic violence complaint.

On cross-examination, Sgt. Gooden acknowledged that she investigated several persons as possibly responsible for the victim's disappearance.

On redirect examination, Sgt. Gooden stated that one of the tips she got through Crime Stoppers was that the victim's body would be found in the trunk of her car at the Willow Creek Apartments. A Crime Stoppers tip also claimed that the Defendant had killed the victim. She gave this information to the homicide department.

LaDonna Garfield, the victim's aunt, testified that she and the victim had been close. She identified the Defendant as the victim's ex-boyfriend, explaining that "they had broke up." On Wednesday evening, November 17, 2010, the Defendant called and told her that he thought something had happened to the victim. The conversation was short because Garfield had to go to work. The next morning, the Defendant called again, repeating that he thought something had happened to the victim. Garfield spoke with him several more times over the phone that day and the next day after the missing persons report was filed. The Defendant continued to call her over the next several days "on up until the day he was arrested." His calls focused on his concerns over the victim.

Garfield testified that, on February 22, 2010, the victim had been living with Garfield's parents on Cedarwoods Cove. Garfield was in bed in the front bedroom when she heard a scream. When she got up to investigate, the victim walked past her "crying and upset." The victim went into the bathroom and locked the door. Garfield went to the carport door where her father was and looked out. She saw the Defendant in the Defendant's mother's car. She returned to the victim, who came out of the bathroom and sat down on the couch in the den. Garfield described the victim's appearance as disheveled. Garfield kept asking the victim what had happened, and the victim told her that she had gotten into an altercation with the Defendant at the Defendant's house. When the victim left in her car, the Defendant followed her. The victim drove to Cedarwoods Cove and, as she was trying to get in the house, the Defendant approached her and kept trying to talk to her. The victim told him she did not want to have anything more to do with him. The Defendant told her that he would leave, but first he wanted her to give him a hug. The victim told Garfield that, when she told him no, "he grabbed her and started choking her and she's trying to get away and he slammed her down on the concrete."

On cross-examination, Garfield stated that the last time she saw the victim and the Defendant together was in July 2010.

Britney Harrell, ex-girlfriend of the Defendant's friend Rodricus Shaw, testified that, while she was talking on the phone with Shaw, she overheard the

Defendant "saying that he didn't mean to kill her." She stated that she was familiar with the Defendant's voice. The following week, she overheard a phone conversation between Shaw and the Defendant while Shaw's phone was in speaker-phone mode. She heard the Defendant say that he had killed "her," put her body in the car, and then drove the car to some apartments in east Memphis. She reported this information to the police. She later gave a statement to the police and identified the Defendant in a photographic array. Underneath his photograph, she wrote, "This is Richard Dickerson who killed Jacklyn Miller."

Vincent Ingram testified that he and the Defendant had been friends since childhood. In November 2010, he lived around the corner from the Defendant. One day, the Defendant told him that he, the Defendant, thought that the victim was "setting him up" because he had found some text messages on her phone giving "some guy" the directions to the Defendant's house. The Defendant told Ingram that he was going to talk to the victim about it and that she was on her way over. Later, Ingram saw the victim getting out of her car in front of the Defendant's house. Later that night, the Defendant came over to Ingram's house, woke Ingram up, and told Ingram that he thought he had killed the victim. The Defendant told Ingram that he had strangled the victim and that she was not moving. The Defendant then left. Sometime in the next day or two, Ingram and Shaw were at the Defendant's house. Ingram overheard the Defendant tell Shaw that he, the Defendant, had killed the victim and put her body in the trunk of her car.

Subsequently, Ingram identified the Defendant from a photographic array. On the array he wrote, "This is Richard. He told me him and Jacky had a fight which led to him choking her to death."

On cross-examination, Ingram stated that, when the Defendant first told him about what he had done, the Defendant "was kind of shaken up a whole lot." Ingram had no doubt that the Defendant loved the victim, and the Defendant expressed remorse about what he had done.

Craig Holmes testified that he was the Defendant's cellmate in December 2010. The Defendant told him that he had strangled his girlfriend.

Fred Anderson testified that he was a "courtesy officer" at Willow Creek Apartments in November 2010. His job was to patrol and make sure that nothing was out of the ordinary. Anderson stated that the first time he saw the victim's Mazda was on November 17, 2010. He noticed the victim's Mazda because he had not seen that car before. When he first saw the Mazda, he noticed "a black male walking away from the car." He had not seen that person before, but he got a good look at him. Anderson identified the Defendant as the black male he saw.

Anderson testified that, after he made a full circle around the parking complex, he saw that the Mazda had been moved and "backed in." He reported what he had seen to his supervisor.

Anderson continued to see the car in the parking lot for one week. It stayed in the same place during this time. He explained that he was away at his other job when the police came to get the car.

On cross-examination, Anderson clarified that it was between 2:00 p.m. and 3:00 p.m. when he first saw the Mazda. The next time he saw it was about four to five minutes later.

Officer Russell Mooney of the MPD testified that he responded to an apartment complex after receiving a report about the victim's car. After locating the car, he notified his lieutenant. Officer Mooney described the car's location as "backed in against the fence." He remained on the scene until the car was towed. No one opened the car or inventoried it prior to its being towed away.

Officer Dewayne Johnson, a crime scene investigator with the MPD, responded to the Willow Tree Apartments on November 23, 2010, regarding a car found there that belonged to a missing person. After photographs were taken of the scene, he followed the car as it was towed to the Crime Scene Office ("CSO"). The car was not opened prior to its arriving at the CSO. After the vehicle was positioned in the CSO, Officer Johnson processed its exterior for fingerprints. He did not find any fingerprints. Officer Johnson then used an entry tool on the locked car to open the door. Officer Johnson took photographs of the car's interior and swabbed for DNA. When officers finished searching the interior of the car, they opened the trunk and found the victim's body.

On cross-examination, Officer Johnson stated that he dusted the inside of the car for fingerprints but did not recover any.

Officer Kevin Lundy, a homicide investigator with the MPD, responded to the victim's car at the CSO. He identified photographs taken of the victim's body in the trunk of her car. He stated that, although the victim was clothed, her clothing was disheveled. The victim's bra was twisted and above her breasts, her panties were around her thighs, and her pants were unzipped and down around her hips. There was a rope around the victim's neck.

On further investigation, Officer Lundy learned that the Defendant had been the last person known to have seen the victim. Officer Lundy prepared a photographic array with the Defendant's photograph and showed the array to Anderson on November 24, 2010. Anderson identified the Defendant's photograph as the man he had seen near the victim's car in the apartment complex parking lot.

Officer Lundy obtained a search warrant for the Defendant's residence. In the garage, he found some rope hanging on the wall. The rope was photographed, collected, and transmitted to the Tennessee Bureau of Investigation ("TBI"). Law enforcement also collected a DNA sample from the Defendant with the Defendant's consent.

Donna Nelson, a special agent forensic scientist with the serology DNA unit at the Memphis Regional Crime Laboratory, testified that blood located on underwear recovered from the victim's body matched the Defendant's DNA.

Special Agent Linda Littlejohn of the TBI Crime Laboratory testified that she performed fiber comparisons. She analyzed the rope recovered from the victim's body and the rope recovered from the Defendant's residence. She testified that the two ropes did not match.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that she performed an autopsy on the victim on November 24, 2010. She determined the cause of death to be "asphyxiation due to ligature strangulation." Dr. Chancellor explained that, although it took two to three minutes to accomplish an individual's death by strangulation, the individual would lose consciousness in less than ten seconds.

Officer Darnell Bridgeforth, Jr., of the MPD testified that he responded to the Cedarwoods Cove address on February 22, 2010, on a domestic assault call. He spoke with the black female victim who stated that she had been assaulted by her boyfriend. Officer Bridgeforth described the victim's demeanor as "distraught" and added that her hair was "messed up." She advised him that her boyfriend was Richard Dickerson. After reviewing his report, he identified the victim as the victim in this case.

Barbara Scott, an employee of the Hair Design School in Memphis, testified that the victim was one of her students. The Defendant was also one of her students. She testified that the victim and the Defendant met at the school and began dating. Scott stated that, in late February 2010, she noticed bruises around the victim's neck. The victim did not tell her how she got the bruises.

Monica Parker testified that she went to "hair school" with the victim and that they had been friends. She also knew the Defendant from school. Beginning in August 2010, the victim stayed with Parker at Parker's apartment two or three nights a week. On one occasion after the victim began staying with her, the Defendant called Parker and told her that the victim was on her way to Parker's apartment "and that she might be crying." When Parker asked the Defendant why the victim might be crying, he told her that he spit on her. When the victim arrived, the victim told Parker that the Defendant had bitten her. The victim showed Parker what appeared to be a bite mark on the victim's cheek.

On cross-examination, Parker explained that, when the victim was not spending the night at Parker's apartment, the victim was with either her grandmother or with the Defendant. At one point, the victim's grandmother "put her out" because the victim had resumed her relationship with the Defendant. Parker stated that the bite mark was not bleeding when she observed it. During her

phone call with the Defendant, the Defendant told her that he had not meant to hurt the victim.

The Defendant testified that he was responsible for the victim's death.  He explained that she came over to his house and that they started to have sex.  They stopped, however, because the victim wanted to talk to him.  They got into an argument.  The victim "start[ed] swinging."  He told her to stop, but, he testified,

> she kept swinging.  I grabbed her told her to stop.  She kept on and I like was choking her but I wasn't trying to—I wasn't trying to harm her.  I wasn't trying to kill her and like I put her on the floor and got on top of her and told her to stop swinging at me and she kept on doing that and she just stopped.  She stopped.  After I noticed she done closed her eyes, I panicked.  I wanted to call the police but I was scared.

When the Defendant realized that the victim was dead, he put her clothes on her body and put her body in the trunk of her car and drove to some nearby apartments.

Asked about the rope around the victim's neck, the Defendant answered,

> We already had some rope in that trunk of that car and it was like a small portion of it.  I didn't want to put the rope around her neck but like I got scared just—I just tied it around her neck because I don't know if I was driving the car or she would just wake up or what.  I didn't know what would happen.  I don't know.  I didn't put it on there tight.  I just wrapped it around there and like cut the ends up off of it.

The Defendant denied that he planned or expected to kill the victim.

In rebuttal, the State re-called Monica Parker.  Parker testified that she never saw the victim scream at anyone or hit anyone.  She testified about an occasion at "hair school" when she was talking to the victim on the phone and, when the Defendant realized she was speaking with the victim, the Defendant "went off" on her (Parker), "yelling and screaming" at her.

The State also re-called Barbara Scott, who described the victim as "a very loving, caring, happy little girl that had been sheltered."  Scott described the Defendant as "a young man that was very angry and violent."  She explained that he had been subject to discipline at the hair school for "outbursts or cursing."

After considering this proof, the jury convicted the Defendant of the lesser-included offense of second degree murder.  After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to the maximum term of

twenty-five years' incarceration.  In this appeal, the Defendant contends that the trial court should have granted a mistrial following "jury misconduct"; that the trial court erred in admitting proof of the Defendant's prior bad acts; and that his sentence is excessive.  We will review each of these issues in turn.

*State v. Dickerson*, 2014 WL 1102003, at *1–6.

On post-conviction appeal, the TCCA summarized Petitioner's claims of ineffective

assistance of counsel, the evidence presented at the post-conviction hearing, and the post-

conviction trial court's decision:

> The Petitioner filed a timely petition for post-conviction relief on September 25, 2015, which he amended on December 13, 2016.  He raised numerous complaints in his petition and amended petition, including those pursued on appeal, namely that trial counsel was ineffective in failing to investigate his presentence report and in forcing him to testify at trial.  The post-conviction court conducted evidentiary hearings on the Petitioner's issues on June 24, 2016, and December 13, 2016.
>
> At the June evidentiary hearing, trial counsel testified that he was appointed to represent the Petitioner and had been a criminal defense attorney for eighteen years, handling "hundreds" of murder cases over the course of his practice.  He further testified that "whether or not [the Petitioner] testified" was a "point of contention" between trial counsel and the Petitioner, and the two discussed whether he would testify "at length many, many times."  When trial counsel learned that a particular witness, a friend of the Petitioner's, was going to give the "most damning" testimony against the Petitioner, trial counsel testified that he told the Petitioner that he needed to stop asserting "'it wasn't none of me.'  Because everything suggested it was."  He further explained that he told the Petitioner it was his opinion, based on the State's evidence, that if the Petitioner did not stop asserting "'I didn't do it and it wasn't me and I wasn't there,' that he was going to be convicted and he would serve life in prison."  The Petitioner "didn't believe [trial counsel]" that his friend was going to testify against him, and trial counsel testified that he gave a generic opening statement at trial so that the Petitioner could hear the "damning" testimony before deciding whether he wanted to testify.  Trial counsel stated that the Petitioner decided to testify on his own behalf after hearing his friend's testimony because "he's intelligent enough[;] he saw the testimony."
>
> Regarding the Petitioner's sentencing, trial counsel testified that he did not review the sentencing hearing transcript, but recalled that the Petitioner "won when he didn't get first degree murder."  He further stated that he "did what he could" regarding the Petitioner's sentencing, but that the Petitioner:

[D]idn't really help himself . . . at sentencing he sat back with his arms across three chairs and his body language was like he just didn't care. And I don't know what mitigation I could have put on for him. And the facts were the facts. And the facts were terrible.

The post-conviction court held a second evidentiary hearing on December 13, 2016. The Petitioner affirmed that he was made aware of his rights by both trial counsel and the trial court during his *Momon* hearing and "went on and testified . . . went on with [trial counsel's] strategy." He further affirmed that he testified of his own free will. With respect to his sentencing hearing, the Petitioner alleged that trial counsel did not ask him about his criminal history, but conceded that trial counsel argued the Petitioner's criminal history should not have been considered as an enhancement factor because he completed diversion and therefore did not technically have a criminal history. He further conceded that this frustration was directed more towards the trial court than trial counsel, stating that "[trial counsel] said I didn't have no history, but [the trial court] still allowed certain issues."

Following the evidentiary hearings, the post-conviction court entered a written order denying the Petitioner's petition for post-conviction relief on July 31, 2017. The Petitioner now appeals the denial of his petition.

*Dickerson v. State*, 2018 WL 5307893, at \*5–6.

With this in mind, the Court will now turn to the legal standards governing Petitioner's habeas petition.

## IV.    Legal Standards

Federal courts may issue habeas corpus relief to persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). But a federal court has limited authority and may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). And § 2254 imposes additional requirements a petitioner must satisfy before a federal court may grant habeas relief.

### A.    Exhaustion and Procedural Default

A federal court may not issue a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies. *Cullen v.*

*Pinholster*, 563 U.S. 170, 181 (2011).  Under 28 U.S.C. § 2254(b) and (c), a petitioner seeking

federal habeas relief must first present the claims in his petition to the state courts.  *Id.*  The

petitioner must "fairly present"[3] each claim to all levels of state court review, including the

state's highest court on discretionary review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  That

said, a petitioner need not present to all levels of the state court if the state has removed state

supreme court review as an available state remedy.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–

48 (1999).

Tennessee has done that.  Indeed, Tennessee Supreme Court Rule 39 eliminated the need

to seek review in the Tennessee Supreme Court.  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir.

2003).  Under Rule 39, "once the Court of Criminal Appeals has denied a claim of error, 'the

litigant shall be deemed to have exhausted all available state remedies.'"  *Id.* (quoting Tenn. Sup.

Ct. R. 39); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

There is also a procedural default doctrine much like the exhaustion requirement.  *See*

*Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the

exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an

independent and adequate state ground—such as a procedural rule prohibiting the state court

from reaching the merits of the constitutional claim—the procedural default doctrine ordinarily

bars a petitioner from seeking federal habeas review.[4]  *See Wainwright v. Sykes*, 433 U.S. 72,

---

[3] To exhaust each claim, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

[4] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)); *see also Trimble v. Bobby*, 804 F.3d 767,

81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." (internal quotation marks omitted)).  Generally, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If the procedural default doctrine bars a claim at the state level, a petitioner must show cause to excuse his failure to present the claim.  *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Such a petitioner must also show either (1) actual prejudice stemming from the constitutional violation, or (2) that a failure to review the claim will lead to a fundamental miscarriage of justice.  *Schlup*, 513 U.S. at 320–21.  For the latter, a petitioner must establish that a constitutional error probably led to the conviction of a person who is actually innocent of the crime.  *Id.* at 321; *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (describing the ways to overcome procedural default and the actual innocence exception).

### B.  Merits Review

Under § 2254(d), where a state court has adjudicated a claim on the merits, a federal court cannot grant habeas relief unless the state's adjudication of that claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

777 (6th Cir. 2015).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Walker*, 562 U.S. at 316 (internal quotation marks and citations omitted).

  (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."  *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

  When a petitioner seeks habeas relief related to a claim the state court has adjudicated on the merits, § 2254(d)(1) limits a federal habeas court's review to the record the state court used to adjudicate the claim on the merits.  *Cullen*, 563 U.S. at 181.  A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  An "unreasonable application" of federal law occurs when a state court "identifies the correct governing legal principle from" Supreme Court precedent "but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 412–13.

  A federal court may not grant habeas relief just because, "in its independent judgment," the federal habeas court determines that the "state court decision applied clearly established federal law erroneously or incorrectly."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411) (internal quotation marks omitted).  A federal court can grant habeas relief only if the state court applies clearly established federal law in an "objectively unreasonable" manner.  *Williams*, 529 U.S. at 409.

  There is little case law addressing how to determine whether, under § 2254(d)(2), a state court based its decision on "an unreasonable determination of the facts."  In *Wood v. Allen*, the Supreme Court noted that a state-court factual determination is not "unreasonable" only because

the federal habeas court would have reached a different conclusion.[5]   558 U.S. 90, 301 (2010).
In *Rice v. Collins*, the Court explained that "[r]easonable minds reviewing the record might
disagree" about the factual finding in question, "but on habeas review that does not suffice to
supersede the trial court's . . . determination."  546 U.S. 333, 341–42 (2006).

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not
insatiable," emphasizing that under § 2254(e)(1), a federal habeas court presumes that the state
court's factual determination is correct absent clear and convincing evidence to the contrary.
*Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).  A federal court will not overturn a state
court adjudication on factual grounds unless objectively unreasonable in light of the evidence
presented in state court.  *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011).

### C.    Ineffective Assistance of Counsel

In *Strickland v. Washington*, the Supreme Court set the controlling standards for claims
that ineffective assistance of counsel deprived a defendant of his Sixth Amendment right to
counsel.  466 U.S. 668, 687 (1984).  To succeed on such a claim, a petitioner must satisfy two
elements: (1) that counsel's performance was deficient, and (2) "that the deficient performance
prejudiced the defense."  *Id.*  "The benchmark for judging any claim of ineffectiveness must be
whether counsel's conduct so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a just result."  *Id.* at 686.

---

[5] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a
petitioner must establish only that the state-court factual determination on which the decision
was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut
a presumption that the determination was correct with clear and convincing evidence."  558 U.S.
at 299.  The Court found it unnecessary to reach that issue and left it open "for another day."  *Id.*
at 300–01, 304 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006) (recognizing that it is unsettled
whether there are some factual disputes to which § 2254(e)(1) does not apply)).

What is more, this standard is "even more difficult to meet in habeas cases, where the review that applies to *Strickland* claims is 'doubly deferential.'" *Tackett v. Trierweiler*, 956 F.3d 358, 373 (6th Cir. 2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks and citation omitted).

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A court considering a claim of ineffective assistance applies a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To show prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. And "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) (stating that "*Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail but "places the

---

[6] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel performed deficiently. *Strickland*, 466 U.S. at 697.

burden on the defendant, not the State, to show a reasonable probability that the result would have been different." (internal quotation marks omitted)).

A federal court's deference to a state-court decision under 28 U.S.C. § 2254(d) increases when reviewing an ineffective assistance claim. According to the Supreme Court in *Harrington*:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

562 U.S. at 105 (internal citations and quotation marks omitted).

A criminal defendant is entitled to effective assistance of counsel on direct appeal. *Chase v. Macauley*, 971 F.3d 582, 592 (6th Cir. 2020); *Evitts v. Lucey*, 469 U.S. 387, 393–94 (1985). And so courts evaluate claims for ineffective assistance of appellate counsel under the *Strickland* standards. *See Chase*, 971 F.3d at 592; *see also Pollini v. Robey*, 981 F.3d 486, 493 (6th Cir. 2020); *Hand v. Houk*, 871 F.3d 390, 410 (6th Cir. 2017); *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief). Appellate counsel however has no duty to raise baseless issues. *See Moody v. United States*, 958 F.3d 485, 492 (6th Cir. 2020) ("Of course, failing to raise wholly meritless claims is neither deficient nor prejudicial." (citing *Bennett v. Brewer*, 940 F.3d 279, 286–87 (6th Cir. 2019); *Sutton v. Bell*, 645 F.3d 752, 755 (6th Cir. 2011))). And counsel's failure to raise a nonfrivolous issue on appeal does not automatically equal ineffective assistance. *See Hand*, 871 F.3d at 410 ("Mere failure to raise a potentially viable claim is not enough, as '[a]ppellate counsel need not raise every non-frivolous claim on direct appeal.'" (quoting

*Sanders v. Curtin*, 529 F. App'x 506, 521 (6th Cir. 2013))).  Rather, to establish that appellate

counsel gave ineffective assistance, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them.  If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice.  That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Robbins*, 528 U.S. at 285 (citation omitted).[7]

As stated above, the standard for showing ineffective assistance of appellate counsel is

"extremely deferential," because "counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment."  *Hand*, 871 F.3d at 410 (quoting *Strickland*, 466 U.S. at 690).  "Strategic decisions of

counsel, including whether to raise some non-frivolous claims over others, fall well within the

range of professional competence."  *Id.* at 411.  Indeed, "the process of 'winnowing out weaker

arguments on appeal' is 'the hallmark of effective appellate advocacy.'"  *Id.* (quoting *Smith v.

Murray*, 477 U.S. 527, 536 (1986)); *see also Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017)

---

[7] The Sixth Circuit has provided a nonexclusive list of factors to consider when analyzing claims for ineffective assistance of appellate counsel:

    (1)     Were the omitted issues "significant and obvious"?
    (2)     Was there arguably contrary authority on the omitted issues?
    (3)     Were the omitted issues clearly stronger than those presented?
    (4)     Were the omitted issues objected to at trial?
    (5)     Were the trial court's rulings subject to deference on appeal?
    (6)     Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
    (7)     What was appellate counsel's level of experience and expertise?
    (8)     Did the petitioner and appellate counsel meet and go over possible issues?
    (9)     Is there evidence that counsel reviewed all the facts?
    (10)   Were the omitted issues dealt with in other assignments of error?
    (11)   Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Chase*, 971 F.3d at 592–93 (quoting *Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir. 1999)).

("Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed." (citing *Murray*, 477 U.S. at 536; *Jones v. Barnes*, 463 U.S. 745, 751–53 (1983))).  "Declining to raise a claim on appeal, therefore, is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court."  *Davila*, 137 S. Ct. at 2067 (citing *Robbins*, 528 U.S. at 288); *see also Hand*, 871 F.3d at 411.  What is more, "failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal."  *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004) (citing *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)); *see also Carter v. Parris*, 910 F.3d 835, 841 (6th Cir. 2018).

Generally, the constitutional right to counsel ends with a defendant's direct appeal.  In *Coleman v. Thompson*, the Supreme Court found that "[t]here is no constitutional right to an attorney in state post-conviction proceedings."  501 U.S. at 752 (internal citations omitted).  And as a result, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."  *Id*.  What is more, attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error."  *Id.* at 753 (internal quotation marks omitted).  So when the state has no constitutional obligation to ensure that a prisoner has competent counsel, the petitioner bears the risk of attorney error.  *Id.* at 754.

There is, however, a narrow exception to the rule in *Coleman*.  In *Martinez v. Ryan*, the Supreme Court considered an Arizona law that did not permit petitioners to raise ineffective assistance claims on direct appeal.  566 U.S. 1, 6 (2012).  The Court held that, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a

substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17. The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here," and "[i]t does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 16. To excuse a procedural default under *Martinez*, a petitioner must show that

> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an  ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (internal quotations and citations omitted).

In *Trevino*, the Supreme Court extended its *Martinez* holding to states which have a "state procedural framework, by reason of its design and operation, [that] makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." 569 U.S. at 429. Thus, *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default. What is more, the Sixth Circuit has found that both *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

The Court now considers Petitioner's § 2254 claims.

## V.    Analysis of Petitioner's Claims for Ineffective Assistance of Trial Counsel

As stated above, Petitioner asserts that trial counsel gave ineffective assistance by: (1) "coercing and or forcing [Petitioner] to testify at trial against his will"; and (2) "not correct[ing]

the [trial] court's erroneous application of [Petitioner's] criminal history." (ECF No. 14 at PageID 1538, 1541.) The Court will address each claim in turn.

### A.     Testifying at Trial

Petitioner contends that his trial counsel in the state court proceedings gave ineffective assistance by "forcing [Petitioner] to testify against his will by way of threats." (*Id.* at PageID 1538.) Petitioner asserts that "[t] record clearly shows that the choice to testify was not of [Petitioner's] own free will but instead by the will of the trial attorney through coercion." (*Id.*) And according to Petitioner, "[t]his was accomplished under the threat of life imprisonment if he chose not to testify." (*Id.*) Petitioner asserts that during the state court post-conviction proceedings, his trial counsel admitted that Petitioner did not want to testify at trial. (*Id.* at PageID 1539.) And Petitioner states that his trial counsel "argued that the Petitioner should testify from the beginning . . . right up until the jury came out." (*Id.*)

Petitioner states that "the proof at the post-conviction hearing shows that the decision [to testify] was a product not of free will but one of fear and intimidation." (*Id.*) Petitioner emphasizes that his trial counsel said Petitioner would be convicted and serve life in prison if Petitioner chose to maintain, "I didn't do it and it wasn't me and I wasn't there." (*Id.*) And according to the petition, "Petitioner was prejudiced by this ineffective assistance because [Petitioner's] testimony necessarily implicated him as the assailant and precluded any possibility of a not guilty verdict." (*Id.*) Petitioner asserts that the TCCA's analysis of this issue "is in conflict, irrelevant and in direct violation of the mandates of the Constitution," according to which "it was [Petitioner's] right and choice to not testify." (*Id.*)

Respondent counters that the TCCA "correctly identified and applied *Strickland* to analyze this claim," and that "[t]he state court's rejection of this claim was not unreasonable."

(ECF No. 13 at PageID 1528–29.) Respondent emphasizes that the post-conviction trial court credited trial counsel's testimony that he did not force Petitioner to testify, and the TCCA implicitly adopted this credibility determination. (*Id.* at PageID 1529.)

Having identified *Strickland* as the proper federal standard for analyzing Petitioner's ineffective assistance claim, the TCCA considered the issue and opined:

> The record wholly supports the post-conviction court's finding that the Petitioner received effective assistance of counsel. The transcripts of the post-conviction evidentiary hearings reveal, based on both trial counsel's testimony and the Petitioner's own testimony, that the Petitioner understood he did not have to testify but decided to do so anyway of his own free will after hearing "damning" testimony against him. Further, the Petitioner had the opportunity to discuss whether he would testify at length multiple times with trial counsel, and trial counsel even gave him the opportunity to hear the testimony against him before deciding whether to testify. Although the Petitioner argues that trial counsel's "threat of life imprisonment" forced him to testify, trial counsel testified he only told the Petitioner that it was his opinion that, based on the amount of evidence that the State had against him, he would be convicted of first degree premeditated murder as charged and sentenced to life imprisonment if he continued to deny that he had any involvement in the murder, and the post-conviction court accredited such testimony. In following trial counsel's advice, the Petitioner's testifying allowed the jury to find an absence of premeditation, leading to him being convicted of second degree murder, a lesser offense. Again, as we have laid out, the Petitioner affirmed both at his *Momon* colloquy and at the evidentiary hearing that he testified of his own free will. Based on the overwhelming physical and testimonial evidence against the Petitioner presented by the State at trial, the Petitioner has failed to show how his testimony prejudiced him or how trial counsel was deficient. In fact, the record indicates that following trial counsel's advice to testify was beneficial to the Petitioner.

*Dickerson v. State*, 2018 WL 5307893, at *7.

Petitioner does not explain how the TCCA's decision is contrary to *Strickland*. Petitioner's assertion that the decision conflicts with and directly violates constitutional mandates is vague and insufficient for this purpose. Petitioner therefore has not met his burden of showing that the TCCA reached an objectively unreasonable decision. As stated above, this Court presumes the correctness of the state court's factual findings absent clear and convincing

evidence to the contrary.  28 U.S.C. §§ 2254(d)(2), 2254(e)(1).  Petitioner provides no evidence refuting this presumption.  Nor does he provide any arguments about the state court's factual determinations.

What is more, during Petitioner's *Momon* colloquy at trial, Petitioner testified that he spoke with trial counsel every day of the trial about whether Petitioner would testify.  (ECF No. 12-6 at PageID 791.)  Petitioner acknowledged that he understood he did not have to testify at trial.  (*Id.* at PageID 791–92.)  Petitioner, though, stated and reaffirmed that he wanted to testify.  (*Id.*)

At the post-conviction hearing, Petitioner testified that by the third day of trial, his trial counsel stated that the "odds w[ere] against [Petitioner]" and that Petitioner had two options, "to testify or . . . to get life [in prison]." (ECF No. 12-19 at PageID 1399–1400.)  Petitioner testified that "at that moment [Petitioner] went with whatever [trial counsel's] strategy was." (*Id.* at PageID 1401.)  Petitioner acknowledged during cross-examination that he "went on and testified" of his own free will.  (*Id.* at PageID 1406.)

Trial counsel testified that the State never offered a plea deal in Petitioner's case.  (ECF No. 12-18 at PageID 1374.)  Counsel testified that the State rejected a proposal involving Petitioner pleading guilty to manslaughter.  (*Id.*)  Counsel also testified that because of the overwhelming evidence against Petitioner—including testimony from childhood friend, Vincent Ingram—Petitioner had no options other than testifying to a defense like self-defense, voluntary manslaughter, or accidental death.  (*Id.* at PageID 1377.)  According to trial counsel's testimony, he and Petitioner at first disagreed about whether Petitioner would testify, because Petitioner did not "believe that the testimony was going to evolve like it did." (*Id.* at PageID 1378.)  Counsel testified that in his opinion, the fact that the jury did not convict Petitioner of first-degree murder

counted as a win.  (*Id.* at PageID 1380.)  During his testimony, trial counsel opined that

Petitioner would have received a life sentence if Petitioner maintained "I didn't do it and it

wasn't me and I wasn't there."  (*Id.* at PageID 1385–86.)  Trial counsel testified that he told

Petitioner this during trial and that it was "still [counsel's] opinion today."  (*Id.* at PageID 1386.)

Indeed, the trial record shows that the State presented overwhelming proof against

Petitioner.  (ECF Nos. 12-3; 12-4; 12-5; 12-6.)  Petitioner's childhood friend, Vincent Ingram,

testified to seeing the victim pull up to Petitioner's house and that Petitioner came to Ingram's

house later that night and confessed to killing the victim by strangling her.  (ECF No. 12-5 at

PageID 638–43.)  And trial counsel's post-conviction testimony tracks the proof adduced at trial.

(ECF No. 12-18.)  While the circumstances may have compelled Petitioner to testify in his own

defense, trial counsel did not coerce his testimony or force him to testify.  And Petitioner

provides no evidence that trial counsel threatened him.  Rather, trial counsel explained to

Petitioner the trial's likely outcome given the overwhelming evidence against him.  Petitioner's

position is untenable.  And the TCCA did not base its decision on an unreasonable determination

of the facts.  The record shows that Petitioner's trial counsel gave him well-reasoned advice, not

ineffective assistance.  For these reasons, deference to the state court decision on this issue is

appropriate.  The Court therefore **DENIES** this claim.

### B.      Criminal History

Petitioner next asserts that his trial counsel appointed in the state court proceedings gave

ineffective assistance by "not correct[ing] the [trial] court's erroneous application of

[Petitioner's] criminal history."  (ECF No. 14 at PageID 1541.)  Petitioner contends that trial

counsel failed to object to the trial court's "impression that the petitioner pled guilty as charged

to a count of facilitation of aggravated assault which was subsequently diverted."  (*Id.*)

According to the petition, Petitioner "did not plead guilty to a D Felony but instead pled guilty to Assault-Bodily harm, a Misdemeanor." (*Id.*)  Petitioner also alleges that trial counsel failed to object to the trial court's determination of "criminal activity because [Petitioner] self reported that he became associated with the Blood Gang at age seventeen and [ ] was still in contact with members of this gang." (*Id.*)

Respondent counters that the TCCA's rejection of this claim was not unreasonable under § 2254(d). (ECF No. 13 at PageID 1526.)  Respondent notes that the TCCA "correctly identified and applied *Strickland* to analyze this claim." (*Id.*)  And Respondent emphasizes that testimony at the post-conviction hearing and the sentencing transcript both show that trial counsel raised Petitioner's argument. (*Id.* at PageID 1527.)

After identifying *Strickland* as setting forth the applicable standard, the TCCA analyzed the claim:

> With respect to the Petitioner's argument that he received ineffective assistance because trial counsel did not correct the court's erroneous application of his criminal history, the evidentiary hearing transcripts reveal that such an argument is contradictory to the Petitioner's own post-conviction testimony.  The Petitioner affirmed that trial counsel argued against the court's consideration of the Petitioner's prior criminal history as an enhancement factor, stating that his completion of diversion meant the Petitioner technically did not have a criminal record.  The Petitioner also affirmed that his frustration was really directed toward the trial court for considering his criminal history, not toward trial counsel.  Trial counsel testified that he did everything possible for the Petitioner with respect to sentencing.  Further, the post-conviction court noted that even if trial counsel had not objected to the use of the Petitioner's criminal history as an enhancement factor, it is "within the court's discretion to impose any sentence allowable under the appropriate range of punishment."  Therefore, the Petitioner has failed to show how trial counsel was deficient or how he was prejudiced.  In sum, we conclude that the post-conviction court properly determined that the Petitioner failed to meet his burden of demonstrating that trial counsel was ineffective, and we accordingly affirm the denial of the petition.

*Dickerson v. State*, 2018 WL 5307893, at *8.  The TCCA also noted that Petitioner "conceded that trial counsel argued the Petitioner's criminal history should not have been considered as an

enhancement factor because he completed diversion and therefore did not technically have a criminal history." *Id.* at *6.

Trial counsel argued at sentencing that the state court judge should impose a sentence for Petitioner at the low end of the sentencing range, emphasizing at the sentencing hearing that Petitioner had zero criminal history points and no criminal convictions. (ECF No. 12-9 at PageID 1112–13.) The trial court disagreed with counsel's argument, finding that Petitioner had prior criminal behavior based on a criminal case that was dismissed after Petitioner successfully completed diversion. (*Id.* at PageID 1117.) The trial court also found Petitioner's association and continued contact with gang members qualified as criminal behavior. (*Id.* at PageID 1118.)

Trial counsel testified at the post-conviction hearing that, after sobbing during the entire trial, Petitioner "sat back (at the sentencing hearing) with his arms across three chairs and his body language was like he just didn't care." (ECF No. 12-18 at PageID 1374.) Counsel testified that he had few options for mitigating the sentence because "the facts were terrible." (*Id.*) According to Petitioner's post-conviction testimony, trial counsel never asked Petitioner about his criminal history or that he pleaded guilty to assault bodily harm, an A misdemeanor, rather than facilitation of aggravated assault, a D felony. (ECF No. 12-19 at PageID 1403–04.) But Petitioner acknowledged that trial counsel argued that because Petitioner successfully completed diversion, he had no criminal history at all. (*Id.* at PageID 1408–09.) Petitioner testified that despite trial counsel's arguments, the trial court "still allowed" it. (*Id.* at PageID 1409.) Petitioner acknowledged that post-conviction counsel had told him that the "judge can use a case that was diverted to enhance." (*Id.* at PageID 1410.)

Based on this Court's review of the transcripts and record, Petitioner has not shown that he suffered any prejudice from counsel's performance at the sentencing hearing. Counsel made

the precise argument that Petitioner requested.  And Petitioner articulates no argument trial counsel chose to disregard that would have changed the sentence formulated and imposed by the trial court.  The TCCA's decision does not violate or unreasonably apply *Strickland*.  Nor did the TCCA base its decision on an unreasonable determination of the facts given the evidence.  As a result, deference to the state court decision on this issue is appropriate.  For these reasons, the Court **DENIES** this claim.

Because the issues raised in this petition lack merit, the Court **DISMISSES** the petition **WITH PREJUDICE**.  The Court will enter judgment for Respondent.

## VI.    Appellate Issues

A petitioner is not always entitled to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003).  In fact, the Court has to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.  A petitioner may not take an appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A court may issue a COA only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must reflect the specific issue or issues that satisfy the required showing.  28 U.S.C. §§ 2253(c)(2)–(3).  A petitioner makes a "substantial showing" when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could disagree

with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed).

Nor does the petitioner have to show that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). But courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

Petitioner's claims here lack merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

For the same reason, the Court also finds that any appeal would not be taken in good faith. The Court therefore **CERTIFIES** under Federal Rule of Appellate Procedure 24(a) that any appeal here would not be taken in good faith, and also **DENIES** leave to appeal in forma pauperis.[8]

**SO ORDERED**, this 29th day of March, 2022.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[8] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis and file a supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).